IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JAMES DANIEL SPORISH, et al.,

                    Plaintiffs,

          v.                                          CIVIL ACTION
                                                      NO. 12-6363
COUNTY OF DELAWARE,
PENNSYLVANIA, et al.,

                    Defendants.

**OPINION**

**Slomsky, J.**                                       **September 18, 2013**

## I.     INTRODUCTION

Plaintiff James Daniel Sporish is incarcerated.  He is the father of Nicole Sporish.  While

Nicole Sporish was in the custody of her mother, she was the subject of dependency proceedings

in the Court of Common Pleas of Delaware County, Pennsylvania.  Ultimately, these proceedings

resulted in her removal from her mother's custody and her placement with Children Youth

Services of Delaware County.

Plaintiff believes his civil rights as a father were violated by the way the dependency

proceedings were handled, and he filed the instant lawsuit to vindicate his rights.  His claims are

based on the length of the proceedings, including hearing postponements, the failure to ensure

his "video presence" at every hearing, and the inability to have his daughter's custody transferred

to his parents who reside in New Jersey.  He also makes other related claims.

Proceeding pro se, Plaintiff filed the instant civil rights suit on behalf of himself and his daughter[1] against Delaware County, Children Youth Services of Delaware County ("CYS"),[2] and individual CYS employees Deirdre Gordon (Administrator), Christine Murphy (Supervisor), Margaret Amoroso (Legal Department Supervisor), Beverley White (Legal Department Intake Supervisor), and Summer Fowlkes (Case Worker).

Presently before the Court is the Joint Motion of Defendants to Dismiss the Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the following reasons, the Court will grant the Motion to Dismiss.[3]

## II.   FACTUAL BACKGROUND

The following facts are recited in a light most favorable to Plaintiff.  Plaintiff James Sporish and Vanessa Onuffer are the biological parents of Nicole Sporish, a minor.  (Doc. No. 3 at 6.)  Since 2007, Plaintiff has been incarcerated at Albion State Correctional Institution.  (Doc. No. 3 at 6; Doc. No. 13-1 at 2.)  Prior to the events giving rise to this suit, Nicole was under the care of her mother.  (Doc. No. 3 at 7.)

---

[1]  On November 26, 2012, the Court informed Plaintiff that he "may not represent his minor daughter in this action" because a "pro se litigant who is not an attorney may not represent someone else in federal court."  (Doc. No. 2 at 2) (citing Osei-Afriyie ex rel. Osei-Afriyie v. Med. Coll. of Pa., 937 F.2d 876, 882-83 (3d Cir. 1991)).  Plaintiff was given thirty days from the date of the Order to find counsel for Nicole Sporish or she would "be dismissed as a party to this action without prejudice."  (Doc. No. 2 at 2.)  As of the date of this Opinion, counsel has not entered an appearance on her behalf and therefore she will be dismissed as a party.

[2]  Children Youth Services of Delaware County is a part of and not a separate entity from Delaware County.  Thus, the proper Defendant in this Section 1983 case is Delaware County.  See Walthour v. Child and Youth Servs., 728 F. Supp. 2d 628, 640-41 (E.D. Pa. 2010) (citing Padilla v. Twp. of Cherry Hill, 110 F. App'x 272, 278 (3d Cir. 2004)).  The claims against Children Youth Services will therefore be addressed as claims against Delaware County, and Children Youth Services will also be dismissed as a Defendant.

[3]  In deciding this motion, the Court has considered the following: the Complaint (Doc. No. 3); Defendants' Motion to Dismiss (Doc. No. 13); Plaintiff's Responses in Opposition (Doc. Nos. 18, 27); and Defendants' Reply (Doc. No. 20).

In July 2011, Children Youth Services of Delaware County ("CYS") began monitoring Vanessa Onuffer's care of her daughter. (Doc. No. 3 at 6-7, 75.) The CYS investigation was conducted by Defendants Summer Fowlkes and Christine Murphy, and raised suspicions that Ms. Onuffer had severe mental health, drug, and alcohol-related problems. Suspicions were also raised that Onuffer was abusing or neglecting Nicole. (Doc. No. 3 at 6-7.) With the approval of Defendants Deirdre Gordon and Margaret Amoroso, CYS petitioned the Juvenile Division of the Court of Common Pleas of Delaware County (the "juvenile court") to adjudicate Nicole Sporish a dependent child, which would allow CYS to remove her from her mother's custody. (Doc. No. 3 at 7, 75.) Classifying Nicole Sporish as a dependent, however, would put her at risk of being placed in the foster care system. (Id.) Because of this risk, CYS suggested to the court that Nicole could possibly remain in Onuffer's care if Onuffer abided by certain measures. (Id.) As a result, in September 2011, CYS withdrew its initial dependency petition filed in juvenile court. (Doc. No. 3 at 76.)

While the petition was pending, a guardian was appointed for Nicole. In view of this appointment and the proceedings involving Nicole to that point, Plaintiff feared his daughter would be placed in foster care. (Doc. No. 3 at 7-9.) He therefore sent a letter to the court-appointed guardian with contact information for his parents in New Jersey. (Id.) In the letter, Plaintiff expressed his desire that his side of the family, which he referred to as the "family resource," take part in Nicole Sporish's life. (Doc. No. 3 at 65.) Plaintiff also sent this same contact information to CYS. (Id.)

On December 2, 2011, CYS submitted a second dependency petition to the juvenile court, and Plaintiff once again wrote to CYS about his "family resource." (Doc. No. 3 at 7-8, 76.) The hearing on this petition was originally scheduled for December 13, 2011, but was

continued by the juvenile court several times and finally scheduled for March 6, 2012. (Doc. No. 3 at 73; Doc. No. 13-2 at 5-7, 8-13; Doc. No. 27 at 23-25.) On that date, Nicole Sporish was still in the custody of her mother, and at the request of Vanessa Onuffer's counsel, the March 6th date was rescheduled to a "date to be determined." (Doc. No. 13-2 at 14-16.)

In February 2012, before the March 6th date was continued, a phone call took place between Plaintiff and Defendant Fowlkes. (Doc. No. 3 at 9.) During this call, Plaintiff described his "family resource" and requested that Plaintiff be present at all hearings related to his daughter. (Id.) After Plaintiff stated his preference for Nicole Sporish to live with his family rather than be placed in foster care, Defendant Fowlkes informed him of the relevant conversations she had had with her supervisor, Defendant Murphy. (Id.) Specifically, because Plaintiff's parents resided in New Jersey, Defendants Fowlkes and Murphy recognized the necessity to comply with the Interstate Compact on the Placement of Children ("ICPC").[4] New

---

[4] The Pennsylvania Juvenile Act, 42 Pa. Cons. Stat. § 6301 et seq., sets forth certain requirements for transferring custody of children to another state. A treatise on the subject describes the process as follows:

> Many jurisdictions, including Pennsylvania, are parties to the Interstate Compact on the Placement of Children, which requires the party states to cooperate with each other in the interstate placement of children.
>
> If a child is found to be a dependent child, custody of the child may be transferred to the juvenile court of another state if authorized by and in accordance with the statute relating to ordering foreign supervision.

Jersey authorities would have to be notified and give their approval for Nicole to be placed into out-of-state custody. (Id.) Defendant Fowlkes told Plaintiff that her supervisor, Defendant Murphy, had contacted the New Jersey authorities and learned that an ICPC would take from six months to a full year to be processed. (Id.) Defendant Fowlkes told Plaintiff she would immediately submit the ICPC paperwork and also inquire if there were any other procedures available to enable his parents to have temporary custody of Nicole. (Doc. No. 3 at 10.)

On March 28, 2012, at Defendant Murphy and Defendant Fowlkes' request, Defendants Gordon and Amoroso filed an application with the juvenile court to take Nicole Sporish into emergency protective custody. (Doc. No. 3 at 10, 76.) A juvenile court judge then entered an emergency protective custody order, and CYS and the police removed the child from her mother's care. (Doc. No. 3 at 10, 15, 77.) A hearing was held the next day, as required by statute, and the presiding Master gave legal and physical custody of Nicole Sporish to CYS. (Doc. No. 13-3 at 2-4.) The juvenile court judge ratified the Master's recommendation on March 30, 2012. (Doc. No. 13-3 at 4.) Plaintiff was not present at any hearing on the emergency petition.

Following the events of late March, Plaintiff again spoke with Defendant Fowlkes. (Doc. No. 3 at 10.) Defendant Fowlkes informed him that she had spoken to his parents about their

---

> Any child in one state who requires placement in another state must receive the maximum opportunity to be placed in a suitable environment and with persons or institutions having appropriate qualifications and facilities to provide a necessary and desirable degree and type of care. A sending state must not send or cause to be sent or brought into any other state any child for placement in foster care or as a preliminary to possible adoption unless the sending state complies with every requirement of the receiving state governing placement of children.

15A Summ. Pa. Jur. 2d Family Law § 14:16 (2d ed.) (citations omitted).

willingness to take on Nicole. She said the ICPC had not yet been sent to New Jersey, but would be sent soon, and also explained that there might be alternative channels beyond the ICPC process to give his parents custody. (Doc. No. 3 at 11.) Plaintiff informed her that he wanted his mother to attend the dependency hearing scheduled for April 17, 2012, even if she had to be subpoenaed. (Doc. No. 3 at 12; Doc. No. 13-3 at 3.)

The April 17th hearing was ultimately continued, but Plaintiff's mother told him she had been instructed by Defendant Fowlkes and her supervisor not to attend the hearing. (Doc. No. 3 at 12, 73.) Plaintiff wrote to the juvenile court judge, requesting counsel and informing him that Plaintiff believed his "rights were being violated and (CYS) was ignoring the [family] resource." (Doc. No. 3 at 12.)

On May 16, 2012, the juvenile court judge appointed counsel for Plaintiff. (Doc. No. 13-4 at 2-3.) Plaintiff's mother informed him that Defendant Fowlkes had contacted her to schedule a home visit for May 24, 2012, but CYS representatives had not shown up that day. (Doc. No. 3 at 13-14.) When she called Defendant Fowlkes to inquire about the failed home visit, Defendant Fowlkes informed her that she and her supervisor decided it was not necessary because they expected Nicole Sporish to be placed back with her mother by December 13, 2012. (Doc. No. 3 at 14.)

Defendant Fowlkes called Plaintiff at the prison around the end of May to let him know that CYS had decided not to submit the ICPC to New Jersey. (Id.) Plaintiff said he wanted to speak with the juvenile court judge. (Id.) On July 6, 2012, Defendants Gordon and Amoroso petitioned for a dependency hearing to be held on July 13, 2012. (Id.) The position of CYS, as supported by an investigation conducted by Defendants Murphy and Fowlkes, was that Nicole Sporish had no alternative to foster care and that both her legal and physical custody should

remain with CYS. (Id.) Once more, Defendant Fowlkes allegedly instructed Plaintiff's mother not to attend the hearing. (Doc. No. 3 at 15.)

On July 13, 2012, the dependency hearing for Nicole Sporish was held in juvenile court. Plaintiff was present by video conference, as was his court-appointed counsel. (Doc. No. 3 at 15, 73.) During the hearing, Defendant Fowlkes testified about the various discussions she had with the Plaintiff and his parents, and she informed the court that she did in fact intend to submit the ICPC to New Jersey, contrary to what she had told Plaintiff earlier. (Doc. No. 3 at 15-16, 54.) The attorney for CYS explained that the ICPC could not be sent to New Jersey, however, until Nicole Sporish's dependency status was adjudicated by the juvenile court. (Doc. No. 3 at 16, 59.) The juvenile court judge concluded the hearing by finding Nicole Sporish to be a dependent and ordering her to remain in CYS custody. (Doc. No. 3 at 16.)

On August 30, 2012, a new CYS caseworker filed the ICPC paperwork. (Doc. No. 3 at 15.) The new caseworker visited the home of Plaintiff's parents and found it met all relevant requirements. (Doc. No. 3 at 17.) A permanency hearing was then held on September 28, 2012 and Plaintiff was again present by video conference. (Doc. No. 3 at 17, 73.) At the hearing, Plaintiff's mother testified about her willingness to care for her grandchild; the new caseworker testified about her home study visit; Nicole Sporish's attorney explained that she did in fact want to live with her grandparents; and Vanessa Onuffer's attorney said there was no objection to Nicole Sporish living with her grandparents. (Doc. No. 3 at 17-18.) Plaintiff's appointed counsel claimed that the ICPC procedures were not required in Nicole's case. (Doc. No. at 18.) At the conclusion of the hearing, however, the juvenile court judge ordered CYS to retain custody of Nicole Sporish until the ICPC process had concluded. (Doc. No. 3 at 18-19.) The judge also ordered New Jersey to accelerate the ICPC process. (Id.)

As a result of these lengthy proceedings involving his daughter, Plaintiff filed the instant civil rights lawsuit against Delaware County and individual CYS employees Deirdre Gordon, Christine Murphy, Margaret Amoroso, Beverley White, and Summer Fowlkes (collectively referred to as "CYS employees"). (Doc. No. 3 at 1.) The Complaint alleges the following violations:[5]

> Count I — 42 U.S.C. § 1983, Fourteenth Amendment Due Process claim against CYS employees, for misrepresenting the facts about the family resource in petitions to the juvenile court in such a way as to make the court believe Plaintiff was disinterested in his daughter's well-being.
>
> Count II — 42 U.S.C. § 1983, Fourteenth Amendment Due Process claim against CYS employees, for misrepresenting Pennsylvania law to Plaintiff, his family, and the juvenile court in order to lead the court to believe there was no one available to care for Nicole Sporish.
>
> Count III — 42 U.S.C. § 1983, Fourteenth Amendment Due Process and Equal Protection claims against CYS employees and Delaware County, for excessively delaying dependency hearings which led the juvenile court to believe there was no family that could take in Nicole Sporish and resulted in her ultimately being adjudicated as dependent.
>
> Count IV — 42 U.S.C. § 1983, Fourteenth Amendment Due Process and Equal Protection claims against CYS employees and Delaware County, for failing to secure Plaintiff's presence by video conference at every hearing which, had it been done, would have enabled Nicole Sporish to live with her grandparents rather than in foster care and prevented further dependency proceedings.
>
> Count V — 42 U.S.C. § 1983, Fourteenth Amendment Due Process and Equal Protection claims against CYS employees, for submitting perjured recommendations in petitions to the juvenile court that listed foster care as the least restrictive placement for Nicole Sporish when in actuality there were family members willing to care for her.

---

[5] Although the Complaint has numbered counts and separate sections for the <u>Monell</u> and emotional distress claims, it is still a challenge to precisely parse out the nature of each claim alleged. It is also difficult to discern the claims that apply to each Defendant. When a party is proceeding pro se, however, a court should afford him latitude in his pleadings, and the Court will do so in this case.

Count VI — 42 U.S.C. § 1983 and 42 U.S.C. § 1985, a conspiracy to violate due process claim against CYS employees.

Count VII — 42 U.S.C. § 1985, against CYS employees, for conspiring to deprive Plaintiff of equal protection of the laws because of his status as a convicted criminal by treating him differently than they would other parents with children undergoing dependency proceedings.

Count VIII — 42 U.S.C. § 1983, Fourteenth Amendment Due Process and Equal Protection claims against CYS employees, for maliciously misapplying state law to prevent family members from having custody of Nicole Sporish.

Count IX — Monell claim, against Delaware County for failing to properly train child welfare workers and supervisors to follow proper procedures.

Count X — Negligent Infliction of Emotional Distress, against Delaware County.

Count XI — Intentional Infliction of Emotional Distress, against Delaware County.

(Doc. No. 3 at 23-48.)

Defendants now jointly move to dismiss the Complaint in its entirety for failure to state a claim that would warrant relief.[6]

## III.    STANDARD OF REVIEW

To survive a motion to dismiss, a plaintiff's complaint must state a plausible claim. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007)).  Iqbal, the leading case on the matter, explained that this plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully."  Id. at 678.  This

---

[6] Because the Court will dismiss all federal claims against Defendants, the Court will decline to exercise supplemental jurisdiction over the remaining state law claims (Counts X and XI).  See 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction. . . . ").

means that a simple recitation of the elements of a claim, accompanied by conclusory statements of law, will not suffice.  Id. (citing Twombly, 550 U.S. at 555).

Applying this principle, in Malleus v. George, the Third Circuit explained that the inquiry requires that a district court: "(1) identify[ ] the elements of the claim, (2) review[ ] the complaint to strike conclusory allegations, and then (3) look[ ] at the well-pleaded components of the complaint and evaluat[e] whether all of the elements identified in part one of the inquiry are sufficiently alleged."  641 F.3d 560, 563 (3d Cir. 2011).  Elements are sufficiently alleged when the facts in the complaint "show" that the plaintiff is entitled to relief.  Iqbal, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).  Deciding whether a claim is plausible will be a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id.

In deciding a motion to dismiss, a court may consider the complaint, "documents that are attached to or submitted with the complaint, and any 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case.'"  Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006) (quoting 5B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (3d ed. 2004)).  Additionally, "'a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.'"  Dougherty v. Wells Fargo Home Loans, Inc., 425 F. Supp. 2d 599, 602-03 (E.D. Pa. 2006) (quoting Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

## IV.    ANALYSIS

### A.  CYS Employees are Entitled to Absolute Immunity from Federal Claims

In Counts I through VIII, Plaintiff claims that CYS employees violated his Fourteenth Amendment rights by the way they handled his daughter's dependency proceedings.  Because the five employees of CYS are entitled to absolute immunity, the Court will dismiss all federal claims against them.[7]

Absolute immunity is a defense "[f]or officials whose special functions or constitutional status requires complete protection from suit."  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982) (citations omitted).  The doctrine has long been associated with judges and prosecutors.  See Butz v. Economou, 438 U.S. 478, 513-515 (1978).  Absolute immunity has also been extended to include "agency officials performing certain functions analogous to those of a prosecutor."  Id. at 515.  This extension is grounded in the idea that "agency officials must make the decision to move forward with an administrative proceeding free from intimidation or harassment."  Id. at 516.  Moreover, there are usually "legal remedies already available to the defendant in such a proceeding [that] provide sufficient checks on agency zeal."  Id.

In Ernst v. Child & Youth Servs. of Chester Cnty., 108 F.3d 486, 495 (3d Cir. 1997), the Third Circuit held "child welfare workers" are entitled to absolute immunity "for their actions on behalf of the state in preparing for, initiating, and prosecuting dependency proceedings."  In reaching this decision, the Third Circuit reasoned that there are certain parallels between prosecutors and child welfare employees:

---

[7]  The November 26, 2012 Court Order dismissing Nicole Sporish as a plaintiff in this case also dismissed the federal claims against the CYS employees based on the doctrine of absolute immunity.  (Doc. No. 2 at 2-3.)  However, in the briefing on the Motion to Dismiss, both parties continue to address the claim against the CYS employees.  Therefore, for the sake of completeness, the Court will explain in more detail the rationale for dismissal of the claim against these employees.

> (1) the functions performed by [child welfare workers] in dependency proceedings are closely analogous to the functions performed by prosecutors in criminal proceedings; (2) the public policy considerations that countenance immunity for prosecutors are applicable to child welfare workers performing these functions; and (3) dependency proceedings incorporate important safeguards that protect citizens from unconstitutional actions by child welfare workers.

Id. at 495.[8]  The court noted that the immunity extended to child welfare workers "is broad enough to include the formulation and presentation of recommendations to the court in the course of such proceedings."  Id.

However, in B.S. v. Somerset Cnty., 704 F.3d 250 (3d Cir. 2013), the Third Circuit stated that its holding in Ernst "[did] not insulate from liability all actions taken by child welfare caseworkers."  Id. at 270 (citing Ernst, 108 F.3d at 497 n.7).  Before finding a child welfare worker is entitled to absolute immunity, a court must scrutinize "the underlying function that the investigation serves and the role the caseworker occupies in carrying it out" and ensure that the worker is acting in a prosecutorial capacity.  Id. (citations omitted).  Actions taken outside of that capacity are not protected.  Id. (citations omitted).

---

[8]  In Ernst, the court described the institutional protections against improper actions by child welfare workers:

> [T]here are alternative mechanisms . . . that protect the public against unconstitutional conduct by child welfare workers.  First, the [state] judicial process itself provides significant protection.  Child welfare workers must seek an adjudication of dependency from a neutral judge whose decisions are guided by the "best interests of the child" and subject to appellate review.  Second, although child welfare workers are not subject to the comprehensive system of professional responsibility applicable to prosecutors, they are under the supervision of the agency that employs them.  The agency has an incentive to ensure that its employees do not violate constitutional rights because it is not immune from suit for abuses committed by employees with policy-making authority or acting pursuant to agency policy or custom.

Ernst, 108 F.3d at 497 (internal citations omitted).

In <u>Somerset Cnty.</u>, a mother brought her child in to see a doctor and the doctor, noticing the child was underweight, contacted Somerset County Children and Youth Services. <u>Id.</u> at 254-255. The employees of the organization then engaged in a cycle of investigation, filing reports, explaining findings to a judge, and "prepar[ing] a corresponding court order to suspend Mother's contact with Daughter and transfer the child to Father's custody." <u>Id.</u> at 254-259. After losing custody, the mother filed suit based upon alleged constitutional violations. <u>Id.</u> at 253.

None of the claims against the individual Somerset County caseworkers were successful. <u>Id.</u> at 270. The court applied the principle expounded in <u>Ernst</u> that "absolute immunity for child welfare employees is appropriate when the employee in question 'formulat[es] and present[s] . . . recommendations to the court' with respect to a child's custody determination, <u>even if those recommendations are made outside the context of a dependency proceeding</u>." <u>Id.</u> at 265 (quoting <u>Ernst</u>, 108 F.3d at 495) (emphasis added). Because the individual employees in <u>Somerset Cnty.</u> took actions that were "fundamentally prosecutorial," they were entitled to absolute immunity. <u>Id.</u> at 270.

On the other hand, in <u>Holloway v. Brush</u>, 220 F.3d 767 (6th Cir. 2000), a Sixth Circuit case applying the principles of <u>Ernst</u>, the court concluded that absolute immunity was not available for certain actions carried out by a child welfare worker. <u>Id.</u> at 776. The <u>Holloway</u> case involved a parent who did not have custody of her children, yet wanted to act on her parental rights, and when she was denied custody, filed suit against the county and individual child welfare workers for their handling of the proceedings related to her children. <u>Id.</u> at 769. Because the employee took actions outside of the "judicial process" that entailed "failing to tell the court that [the mother] had appeared and wished to assert her parental rights, lying to [the mother] about her rights, and failing to inform [the mother] that the matter was still pending," the

Sixth Circuit held that the welfare worker was not entitled to absolute immunity.  <u>Id.</u> at 777.  The

Sixth Circuit, relying on <u>Ernst</u>, explained:

> In <u>Ernst</u>, the court had the opportunity to evaluate the caseworkers' actions
> and to accept or reject their suggestions.  In the case before us, [the
> caseworker's] actions <u>denied</u> the court the opportunity to accept or reject the
> results of her judgment.  A jury could reasonably find that [the caseworker]
> appropriated the entire judicial process to herself by hiding Holloway and
> the court from each other and feeding them inaccurate information by act
> (in Holloway's case) and omission (in both cases).  Even granting <u>arguendo</u>
> that [the caseworker's] actions were motivated by her "formulations of
> professional judgment," the actions themselves bear no resemblance to
> <u>recommendations</u> made to the court.  They were, rather, <u>usurpations</u> of the
> court's authority.

<u>Id.</u> (emphasis in original).  The court thus emphasized that the basis for absolute immunity is

advocacy, <u>id.</u> at 775, which was obviously lacking in <u>Holloway</u>.

In the instant case, Plaintiff alleges that the CYS employees misrepresented the facts

about Nicole Sporish's case and the relevant law in petitions to the juvenile court, to Plaintiff,

and to his family; excessively delayed dependency hearings; failed to secure Plaintiff's presence

by video conference at every hearing; committed perjury; did not expeditiously place Nicole

Sporish with Plaintiff's family; and conspired together to perform all the preceding actions.

Like the child welfare workers in <u>Somerset Cnty.</u>, the CYS employees are entitled to

absolute immunity.  The conduct of CYS employees that Plaintiff complains of occurred directly

within the context of a judicial proceeding, namely, Nicole Sporish's dependency determination.

Unlike the secretive goings-on in <u>Holloway</u>, the scheduling of hearings, who was present at

hearings, and the submission of petitions were not "hidden" from the juvenile court.  The

juvenile court was highly involved.  Ultimately, the juvenile court judge followed the

recommendations of the CYS employees, found Nicole Sporish to be a dependent, and ordered

her to remain in CYS custody <u>despite</u> the family resource.[9]  Thus, the CYS employees acted as advocates in these proceedings and are covered by absolute immunity.

The only events that arguably occurred outside the dependency proceedings were the phone calls between CYS employees and Plaintiff or Plaintiff's family.  These phone calls, however, were made in order to investigate and prepare for the dependency proceeding.  For instance, during the February 2012 phone call, a CYS employee called Plaintiff to inquire about the "family resource" and then learned that the "family resource" would be unable to obtain custody of Nicole Sporish without the completion of the ICPC.  The challenged phone calls here are very different from the actions of child services employees in <u>Holloway</u>, who had fully excluded a mother from her children's custody proceedings.

In sum, all actions taken by CYS employees were in furtherance of dependency proceedings.  The employees were acting in their capacity as advocates for Delaware County in dealing with a neglected child, and are entitled to absolute immunity.  Therefore, the Court will dismiss all federal claims—Counts I through VIII—against CYS employees.

### B.  Plaintiff Has Not Adequately Pled Federal Due Process Claims Against Delaware County

Counts III and IV of the Complaint allege Delaware County violated Plaintiff's due process rights by failing to secure his presence at all hearings and for the excessive delay in the

---

[9] Plaintiff contends that the CYS employees lied about the statutes that govern the dependency process and about the existence of his family resource.  However, this assertion does not rise beyond a bald, conclusory allegation.  The family resource was not deliberately kept secret from the juvenile court, as a CYS employee specifically testified about it at the dependency hearings on July 13, 2012 and September 28, 2012.

dependency proceedings.  For the following reasons, Plaintiff has failed to adequately plead a

procedural due process claim against Delaware County. [10]

The Fourteenth Amendment protects citizens against State deprivation of "life, liberty, or

property, without due process of law."  U.S. Const. amend. XIV, § 1.  The right to due process

"imposes constraints on governmental decisions which deprive individuals of 'liberty' or

'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth

Amendment."  Mathews v. Eldridge, 424 U.S. 319, 332 (1976).  In order to state a procedural

due process claim, "a plaintiff must allege that (1) he was deprived of an individual interest that

is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and

(2) the procedures available to him did not provide 'due process of law.'"  Hill v. Borough of

Kutztown, 455 F.3d 225, 234 (3d Cir. 2006) (quoting Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir.

2000)).

---

[10]  Plaintiff also claims that he was treated differently by Delaware County because he is a
convicted criminal, thereby violating his right to equal protection under the Fourteenth
Amendment.  Where government conduct "substantially burdens a 'fundamental right' or targets
a 'suspect class,' it must be reviewed under strict scrutiny.  On the other hand, if [government
conduct] does not substantially burden a fundamental right or target a suspect class, it is subject
to rational basis review."  Abulkhair v. President of U.S., 494 F. App'x 226, 230 (3d Cir. 2012)
(citation omitted).  "Neither prisoners nor indigents are suspect classes."  Abdul-Akbar v.
McKelvie, 239 F.3d 307, 317 (3d Cir. 2001).  Thus, Delaware County's treatment of Plaintiff
under the equal protection clause is subject to rational basis review.

Plaintiff does not allege sufficient facts to establish a plausible claim of unequal treatment.
Plaintiff is the non-custodial parent of Nicole Sporish.  He was present and participated with
counsel at her dependency and permanency hearings.  The Complaint contains only conclusory
allegations that he was treated differently than other non-custodial parents in a similar situation.
Such allegations fail to state a claim for which relief can be granted.  See Abulkhair, 494 F.
App'x at 230 ("[Plaintiff's] complaint contained no factual basis for his assertions that he
experienced different treatment than non-Muslim applicants. . . .  [Plaintiff's] conclusory
statements that only Muslims experienced delays was not enough to state a claim . . . .").
Consequently, Plaintiff's equal protection claims against Delaware County will also be
dismissed.

Regarding the first element of a procedural due process claim, courts have long recognized that parents do have a constitutionally protected liberty interest in the "custody, care and management of [their] children." Studli v. Children & Youth and Families Cent. Reg'l Office, 346 F. App'x 804, 812 (3d Cir. 2009) (citation omitted). Even in cases where the state has interim custody of a child, "[p]arents . . . maintain a protected liberty interest in a relationship with their children." Santos v. Sec'y of D.H.S., No. 10-7266, 2012 WL 2997036, at *11 (E.D. Pa. July 23, 2012), aff'd, No. 12-4151, 2013 WL 1749474 (3d Cir. Apr. 24, 2013). A non-custodial parent, such as Plaintiff in this case, also "has a liberty interest in his right to communicate with and visit the child." Id. (citations omitted). However, a parent's right is not absolute but "must 'be balanced against the state's interest in protecting children suspected of being abused.'" Somerset Cnty., 704 F.3d at 271 (quoting Miller v. City of Phila., 174 F.3d 368, 373 (3d Cir. 1999)). Regarding the second element of a procedural due process claim, "'the fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.'" Santos , 2012 WL 2997036, at *11 (quoting Miller, 174 F.3d at 373).

In Santos, a case with facts similar to those alleged here, the court dismissed a civil rights complaint filed by an incarcerated father for failure to state claims upon which relief could be granted. 2012 WL 2997036, at *1. Approximately one month after the plaintiff was arrested for a criminal violation, his children, who had been living at home alone since his arrest, were placed in the custody of his sister by a local children and family services agency. Id. at *2. After the plaintiff learned that his sister was being physically abused by her boyfriend, he requested that the agency remove his children from her care and place them with another family member. Id. The agency did remove the children, but instead of placing them with a family member, the agency placed them in foster care. Id. Plaintiff was then informed that his children

were living with a foster family, and, several months later, he was given notice that the agency had filed a Petition for Finding of Involuntary Termination of Parental Rights in state court.  Id. The plaintiff was provided with counsel prior to the hearing.  Id.  At the hearing, the plaintiff's parental rights were terminated and the foster family ultimately adopted his children.  Id. Plaintiff then filed a complaint against the agency and others alleging due process violations, among other constitutional violations.  Id.

The court in Santos dismissed the alleged due process violations for failure to state a claim.  The court explained:

> In this case, Plaintiffs' Amended Complaint fails to allege that their procedural due process rights were violated during the termination hearing. On the contrary, Plaintiff Santos confirms that he was notified about the hearing to terminate his parental rights prior to the hearing date.  Plaintiffs' Amended Complaint is devoid of any allegation that Defendant [agency] prevented Plaintiff Santos from voicing his concerns and requests during the hearing.

Id. at *11 (internal citations omitted).

Here, as in Santos, the Complaint is "devoid of any allegation" that Plaintiff was prevented "from voicing his concerns and requests" during his daughter's dependency proceeds, regardless of any delay in scheduling hearings.  See id. at *11.  It is noteworthy that Plaintiff did not have custody of Nicole Sporish during the relevant time period.  Nor does Plaintiff contend that his daughter was unlawfully removed from her mother's custody.  Rather, Plaintiff's claims are based on the fact that Nicole Sporish was not placed with her grandparents at the conclusion of the dependency proceedings.

Throughout the dependency process, Plaintiff was provided with meaningful opportunity to make his preferences known about the placement of Nicole Sporish.  First, he was provided counsel by the court for the July 13th dependency hearing and the September 28th permanency

hearing. Second, he was present by video conference at both hearings, and his request that

Nicole Sporish reside with his parents was heard and discussed with the court.[11] Finally, at the

September 28th hearing, although the court did not place Nicole Sporish with her grandparents,

the court did order the ICPC process expedited. Thus, the possibility remains open that

Plaintiff's daughter could reside with her grandparents at a future time. Based on these factual

allegations, Plaintiff had "the opportunity to be heard at a meaningful time and in a meaningful

manner" as required under the due process clause. See Miller, 174 F.3d at 373 (quotation marks

and citation omitted). Consequently, Counts III and IV alleging due process violations against

Delaware County will be dismissed.

### C. Insufficient Allegations to Support <u>Monell</u> Claim Against Delaware County

Count IX of the Complaint alleges Delaware County failed to properly train CYS

employees on how to handle a case such as Nicole Sporish's. In the landmark case <u>Monell v.

Dep't. of Social Servs. of City of New York</u>, 436 U.S. 658 (1978), the Supreme Court described

how § 1983 liability applies to local governments:

> [A] local government may not be sued under § 1983 for an injury inflicted
> solely by its employees or agents. Instead, it is when execution of a
> government's policy or custom, whether made by its lawmakers or by those
> whose edicts or acts may fairly be said to represent official policy, inflicts
> the injury that the government as an entity is responsible under § 1983.

Id. at 694. In a subsequent case, <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378 (1989), the Court

noted how the "first inquiry in any case alleging municipal liability under § 1983 is the question

---

[11] Plaintiff was not present at the March 29, 2012 emergency protective custody hearing.
However, even if Plaintiff could have been made available for the hearing by video conference,
for example, the Third Circuit has held that parents do not have a constitutional right to be
present at emergency pre-deprivation hearings because such a requirement "would build delay
into these time-sensitive hearings . . . . [and] would thus inhibit, deter and, at times, subvert the
crucial function of ex parte custody hearings — protecting children who are in imminent danger
of harm." Miller, 174 F.3d at 374.

whether there is a direct causal link between a municipal policy or custom and the alleged

constitutional deprivation." Id. at 385. The Court also noted in City of Canton that "there are

limited circumstances in which an allegation of a 'failure to train' can be the basis for liability

under § 1983." Id. at 387. Specifically, "only where a municipality's failure to train its

employees in a relevant respect evidences a 'deliberate indifference' to the rights of its

inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is

actionable under § 1983." Id. at 389. The weakness of the training needs to be strongly tied to

the harm caused to the plaintiff. A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr., 372

F.3d 572, 582 (3d Cir. 2004) (citing City of Canton, 489 U.S. at 391).

In sum, a sufficient failure to train claim would "identify a failure to provide specific

training that has a causal nexus with [a plaintiff's] injury and [would] demonstrate that the failure

to provide that specific training can reasonably be said to reflect a deliberate indifference to

whether constitutional deprivations of the kind alleged occur." Colburn v. Upper Darby Twp.,

946 F.2d 1017, 1030 (3d Cir. 1991).

In addition, deliberate indifference has been described as follows:

> [It is a] stringent standard of fault, requiring proof that a municipal actor
> disregarded a known or obvious consequence of his action. Thus, when
> city policymakers are on actual or constructive notice that a particular
> omission in their training program causes city employees to violate citizens'
> constitutional rights, the city may be deemed deliberately indifferent if the
> policymakers choose to retain that program. The city's policy of inaction in
> light of notice that its program will cause constitutional violations is the
> functional equivalent of a decision by the city itself to violate the
> Constitution.

Connick v. Thompson, 131 S. Ct. 1350, 1360 (2011) (internal quotations and citations omitted)

(emphasis added). "A pattern of similar constitutional violations by untrained employees is

'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." Id.

(citations omitted).  Alternatively, a showing of deliberate indifference can be made without evidence of a general pattern so long as there is blatancy.  See, e.g., Connick, 131 S. Ct. at 1361 ("[T]he unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations.").

Deliberate indifference is a challenging standard to meet.  For example, in Dennis v. DeJong, 867 F. Supp. 2d 588 (E.D. Pa. 2011), parents sued a number of parties for what had occurred during abuse-related proceedings involving their infant son.  The plaintiffs put forth a number of allegations, including an allegation that "Pennsylvania law and due process require[d] that a dependency hearing be held within 10 days after the dependency petition, not more than four months" later and that "CYS' misrepresentations that [plaintiffs'] parents were not available to care for [their son] violated [a] duty of candor and due process."  Id. at 655.

The Dennis court dismissed the failure to train claim.  In reaching this conclusion, the court first noted that one employee doing a poor job at scheduling did not necessarily amount to "a persistent and widespread practice or custom of Delaware County."  Id. at 636 (citations omitted).  Moreover, "the factual averments regarding Delaware County's policy, custom, or practice [were] nothing more than 'bald assertions' which fail to state a claim upon which relief can be granted."  Id. (internal citations omitted).  The court held that the "plaintiffs [had] not pled a pattern of constitutional violations by untrained employees or that Delaware County or its employees acted with the requisite deliberate indifference."  Id. at 656.

Similar to the plaintiffs in Dennis, Plaintiff's factual allegations are insufficient to state a failure to train claim.  The Complaint simply repeats part of the law comprising a Monell failure to train claim and then makes stark conclusions such as "had Delaware County properly trained their employees, they would have known that . . . the statute mandates a dependency hearing

within 10 days, of the filing of such petition" and "that any facts submitted to the courts may be subject to perjury."  (Doc. No. 3 at 44.)  These allegations also show, at best, an isolated instance of poor scheduling and a conclusory statement about perjury that, even when considered alongside <u>Dennis</u>, does not amount to "a persistent and widespread practice or custom of Delaware County."  In view of the patient efforts made by the County employees on behalf of Nicole Sporish, their efforts to communicate with Plaintiff about his daughter, the appointment of counsel for Plaintiff, and his presence and opportunity to be heard in juvenile court, no deliberate indifference has been shown by Plaintiff.  No blatant conduct has been established. Only "bald assertions" are made which, as in <u>Dennis</u>, are insufficient to state a failure to train claim.  Therefore, the <u>Monell</u> failure to train claim against Delaware County will be dismissed.

## V.    CONCLUSION

Based on the foregoing reasons, the Court will grant Defendants' Motion to Dismiss the Complaint for failure to state a claim.

An appropriate Order follows.